IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| RONALD BARRANCO and PRINT3D CORPORATION, a Nevada corporation, | ) ) ) ) | CIVIL 13-00411 LEK-RLP |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| 3D SYSTEMS CORPORATION, a Delaware corporation, 3D SYSTEMS, INC., a California corporation, DAMON GREGOIRE, JOHN DOES 1-10, JANE DOES 1-10, DOE ENTITIES 1-10; and DOE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT
TO FED. R. CIV. P. 12(b)(1), 12(b)(2), 12(b)(6),
AND SECTION 3 OF THE FEDERAL ARBITRATION ACT OR, IN
THE ALTERNATIVE, TO TRANSFER VENUE PURSUANT TO 28
U.S.C. § 1404 AND GRANTING PLAINTIFFS' MOTION TO STRIKE
ARGUMENTS INCORPORATED BY REFERENCE IN DEFENDANTS'
REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Before the Court are: (1) Defendants 3D Systems
Corporation ("3D Corp."), 3D Systems, Inc. ("3D Inc.,"
collectively, "3D Systems"), and Damon Gregoire's ("Gregoire,"
collectively, "Defendants") Motion to Dismiss Pursuant to Fed. R.
Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and Section 3 of the
Federal Arbitration Act or, in the Alternative, to Transfer Venue
Pursuant to 28 U.S.C. § 1404 ("Motion"), filed on October 21,
2013; [dkt. no. 7;] and (2) Plaintiffs Ronald Barranco

("Barranco") and PRINT3D Corporation's ("Print3D," collectively, "Plaintiffs") Motion to Strike Arguments Incorporated by Reference in Defendants' Reply Memorandum in Support of Motion to Dismiss ("Motion to Strike"), filed on January 15, 2014 [dkt. no. 30] (collectively, "Motions"). Plaintiffs filed their Memorandum in Opposition to the Motion on January 6, 2014, and Defendants filed their Reply on January 14, 2014.[1] [Dkt. nos. 25, 28.] Defendants filed their Response to the Motion to Strike on January 16, 2014. [Dkt. no. 35.]

On January 31, 2014, this Court issued an entering order finding the Motions suitable for disposition without a hearing. [Dkt. no. 39.] After careful consideration of the Motions, supporting and opposing memoranda, and the relevant legal authority, Defendants' Motion is HEREBY DENIED, and Plaintiffs' Motion to Strike is HEREBY GRANTED, for the reasons set forth below.

## BACKGROUND

The Complaint asserts that, for the past thirty years, Barranco has worked in the field of 3D printing, which is the "additive manufacturing process of making a three-dimensional object of virtually any shape from a digital model." Over the

---

[1] On January 15, 2014, Defendants filed an errata to their Reply. [Dkt. no. 29.] On January 22, 2014, Plaintiffs filed an errata to their Memorandum in Opposition. [Dkt. no. 36.]

past fifteen years, Barranco also developed and owned several businesses in the 3D printing industry.  [Complaint at ¶¶ 22-24.]

The Complaint alleges that Barranco owns a fifty percent interest in Print3D, and Deelip Menezes ("Menezes") owns the other fifty percent interest.  Print3D developed and owned a unique plug-in ("Print3D Plug-in") that was designed to price 3D printed products, and was to be installed within existing engineering software.  As of April 13, 2011, the Print3D Plug-in had not been commercially introduced to the 3D printing industry. [Id. at ¶¶ 25-28.]

Plaintiffs allege that, over the past twenty years, Barranco created and owned more than 100 domain names associated with different technologies and businesses in the 3D printing industry.  Examples of domain names that Barranco created include: (1) www.print3d.com ("Print3d.com"); (2) www.stereolithography.com ("Stereolithography.com"); and (3) www.lasersintering.com ("Lasersintering.com").  [Id. at ¶¶ 29-31.]  Stereolithography.com and Lasersintering.com were to license their respective domain names, websites, and instant online quote engines to "third parties who broker physical, three-dimensional printed objects."  [Id. at ¶¶ 32-33.]

According to Plaintiffs, 3D Corp. provides 3D content-to-print solutions, produces 3D printers, integrated print materials, and on-demand custom parts services.  Plaintiffs

allege that 3D Inc. is a subsidiary of 3D Corp.  Plaintiffs also
allege that 3D Inc. is the alter ego and/or agent of 3D Corp.,
and that 3D Corp. is actively involved in the day-to-day
operations of 3D Inc.  Plaintiffs assert that both 3D Corp. and
3D Inc. have: corporate offices located at the same address in
Rock Hill, South Carolina; and common officers and directors,
including Gregoire.  3D Corp. is involved in the acquisitions of
3D Inc., and also transacts business by or on behalf of 3D Inc.
[Id. at ¶¶ 34-41.]

     The Complaint alleges that, on July 10, 2001, 3D
Systems contacted Barranco in Hawai`i to see if he would be
interested in selling Stereolithography.com and its related
business, but Barranco declined.  Defendants contacted Barranco
again on June 6, 2009, this time to see if he would be interested
in selling both Stereolithography.com and Lasersintering.com
(collectively, "Primary Domains") and their related business.
Barranco again declined.  [Id. at ¶¶ 42-43.]  Plaintiffs assert
that 3D Systems invented the stereolithography process and was a
major participant in the stereolithography and laser sintering
sectors of the industry.  Nevertheless, 3D Systems did not own
the domain names "Stereolithography.com" and
"Lasersintering.com", which were valuable to 3D Systems.
Barranco declined to sell his Primary Domains to 3D Systems when

4

a representative called him in Hawai`i on April 6, 2010. [Id. at ¶¶ 44-47.]

Plaintiffs allege that, in mid-February 2011, Abraham Reichental ("Reichental"), President and Chief Executive Officer of 3D Systems, invited Plaintiff and Menezes to 3D Systems' corporate headquarters in Rock Hill to demonstrate and discuss the Print3D Plug-in. On February 17, 2011, Barranco and Menezes met with Reichental, Gregoire, and other 3D Systems representatives in Rock Hill. Plaintiffs allege that, during this meeting, Barranco and Menezes demonstrated the Print3D Plug-in, and Reichental told Barranco that 3D Systems was interested in acquiring the Print3D Plug-in, Print3d.com, and other related assets (collectively, "Printe3D Business"). The parties agreed on a purchase price of $10 million. [Id. at ¶¶ 48-51.] Barranco also informed Reichental that he was undergoing daily chemotherapy treatments for leukemia, which he had been diagnosed with in September 2009. Plaintiffs assert that, due to the progression of Barranco's leukemia, he was interested in selling Print3D. [Id. at ¶ 52.]

On February 18, 2011, Barranco met with 3D Systems representatives, including Sameer Vachani ("Vachani") and Rajeev Kulkarni ("Kulkarni"). [Id. at ¶ 53.] Plaintiffs allege that Vachani and Kulkarni represented to and promised Barranco that, once 3D Systems acquired the Print3D Business, 3D Systems

would: operate the Print3D Business as a separate profit center within 3D Systems; provide substantial support to the Print3D Business in terms of marketing, programming, and other resources; add components to the Print3D Business in order to enhance revenues; feature banner advertisements in the Print3D Business's software, which would create additional revenue; and include the Print3D Plug-in and related software in the sale of 3D printers. [Id.] Plaintiffs allege that Barranco later met with Reichental, who confirmed that 3D Systems would perform these promises if and when it acquired the Print3D Business in order to induce Barranco to sell the Print3D Business to 3D Systems. [Id. at ¶¶ 54-55.] According to Plaintiffs, because the Print3D Plug-in still needed substantial funding in February 2011 for the product launch, Barranco would not have considered selling the Print3D Business unless 3D Systems did not commit to providing such resources after acquisition. [Id. at ¶ 56.]

Plaintiffs allege that, on March 15, 2011, Andrew Johnson ("Johnson"), an in-house attorney for 3D Systems, sent Barranco and Menezes a seven-page letter regarding Print3D's sale of the Print3D Business to 3D Systems ("Agreement Letter"). Barranco executed the Agreement Letter on March 17, 2011. [Id. at ¶¶ 57-59 (citing id., Exh. A).] The Complaint states:

> The [Agreement Letter] provided that the purchase price for the Print3D Business would be paid by Defendant 3D Systems as follows:

6

a. At closing, cash in the amount of $750,000 plus shares of 3D Systems' common stock with a market value not to exceed $250,000.

b. An earn-out ("Earn-Out"), to be comprised of 75% in cash and 25% in 3D Systems' common stock, pain in each of the three years subsequent to the closing, such earn0out calculated at 35% of the Print3D Business' gross revenue for each year.

[Id. at ¶ 61.] Plaintiffs allege that the Agreement Letter also provided: a table that demonstrated how the agreed upon purchase price of $10 million would be achieved; that any investment that 3D Systems made in the Print3D Business after closing would be depreciated and deducted from Print3D's Earn-Out; and that 3D Systems would employ Barranco and Menezes as managers of the Print3D Business. [Id. at ¶¶ 62-64.]

On March 27, 2011, Reichental called Barranco to ask if Barranco and Menezes would meet Reichental and Gregoire in Los Angeles, California to further discuss the sale. Reichental also asked Barranco about his willingness to sell his Primary Domains to 3D Systems. Barranco told Reichental that he and Menezes would meet in Los Angeles to discuss the sale, and that he would personally meet with Reichental and Gregoire to discuss the sale of his Primary Domains. [Id. at ¶¶ 65-66.] Plaintiffs allege that, at that time, "Barranco was still undergoing daily chemotherapy treatments, which affected his mental health." [Id. at ¶ 67.] Plaintiffs contend that, due to the progression of Barranco's disease, he was open to selling his interest in the

7

Print3D Business, as well as his Primary Domains, to 3D Systems. [Id.]

Plaintiffs allege that, on April 3, 2011, Barranco and Menezes met with Gregoire and Johnson in Los Angeles for about three and one-half hours.  The first three hours of the meeting concerned the sale of the Print3D Business to 3D Systems.  The remainder of the meeting was between Barranco, Gregoire, and Johnson, regarding the sale of the Primary Domains to 3D Systems. [Id. at ¶¶ 69-70.]

Plaintiffs allege that, in order to induce Barranco and Print3D to sell the Print3D Business, Gregoire represented that: the Earn-Out was Print3D's best opportunity to maximize the purchase price for the Print3D Business; 3D Systems would make a substantial commitment of resources to the Print3D Business so that Print3D would receive the full amount of the Earn-Out; and the Earn-Out would generate more than $9 million, thereby satisfying the full purchase price of $10 million.  [Id. at ¶¶ 71-74.]  Plaintiffs assert that Gregoire drew a chart that demonstrated how the $10 million purchase price would be achieved.  [Id. at ¶¶ 75-76 (citing id., Exh. B).]  Gregoire also drew a chart detailing how the Earn-Out would be achieved.  [Id. at ¶¶ 77-78 (citing id., Exh. C).]  According to Plaintiffs, Gregoire also told Print3D that, even after acquisition, the Print3D Business would operate as a separate business unit within

8

3D Systems so as to make it easier to determine the amount of the Earn-Out payments, which were to be based on Print3D's generated revenue, and constituted most of the purchase price for the Print3D Business.  [Id. at ¶ 79.]

On April 5, 2011, Barranco met with Reichental and Gregoire.  Most of the meeting focused on the sale of the Primary Domains to 3D Systems.  Reichental and Gregoire promised Barranco that, after acquisition, 3D Systems would make a substantial commitment of resources to the Primary Domains, just as it had promised to do with the Print3D Business.  Plaintiffs allege that Reichental and Gregoire made this representation in order to induce Barranco into selling the Primary Domains to 3D Systems. [Id. at ¶¶ 81-85.]  In order to further induce Barranco, Reichental and Gregoire also promised Barranco to employ him as a manager for 3D Systems for five years, at an annual salary of $150,000, plus an annual bonus of $75,000.  Plaintiffs allege that Gregoire emailed the terms of Barranco's employment to him later the same day.  [Id. at ¶¶ 86-87 (citing id., Exh. D).]

On April 13, 2011, Barranco and Menezes met with Reichental, Gregoire, and other 3D Systems representatives in Rock Hill.  Barranco and Menezes, individually and on behalf of Print3D, signed and executed the "Acquisition Agreement." Gregoire also signed the Acquisition Agreement on behalf of both 3D Corp. and 3D Inc.  [Id. at ¶¶ 88-89 (citing id., Exh. E).]

9

The Complaint alleges:

90. Consistent with the [Agreement Letter], the Acquisition Agreement provided for [3D Systems] to purchase the Print3D Business for a maximum purchase price of $9,925,000, to be paid as follows: (a) an initial payment at closing of $1,000,000, comprised of $750,000 in cash and $250,000 of 3D Systems common stock, and (b) the balance to be paid through the Earn-Out over three years ("the Earn-Out Period").

91. Pursuant to the Acquisition Agreement, the Earn-Out Period was to be divided into three separate "Payout Periods," and each "Payout" in such Payout Period was to be calculated by multiplying 35% times all revenue that [3D Systems] derived from or attributable to the use of the Print3D Business' assets as developed by [3D Systems].

92. The Acquisition Agreement further provided that [3D Systems] would prepare and deliver to [Print3D], within 30 days of the end of each Payout Period, a calculation, prepared in accordance with generally accepted account principles, of the applicable Payout amount.

93. Under the Acquisition Agreement, [3D Systems] agreed during the Earn-Out period to continue the Print3D Business as a separate profit center and as a going concern in the ordinary course of business.

94. The Acquisition Agreement also included a non-competition clause, under which Barranco was to refrain from developing, designing, offering, marketing, or selling or providing services or products including plug-ins related to the design and build of custom parts that had been developed, designed, offered, marketed, sold or otherwise provided by the Print3D Business prior to the closing of the Print3D Business for a period of five years.

[Id. at ¶¶ 90-94.]

Plaintiffs allege that, in executing the Acquisition Agreement, they relied on Gregoire's representation that 3D Systems would commit substantial resources to the Print3D Business after closing, and that 3D Systems would maintained the Print3D Business as a separate profit center during the Earn-Out Period so that Print3D would receive the full purchase price of $9,925,000.  Plaintiffs assert that they would not have executed the Acquisition Agreement if they had known that 3D Systems had no intention to honors its promises and representations, or that 3D Systems had no intention to make payments to Print3D on the Earn-Out.  [Id. at ¶¶ 95-97.]

Plaintiffs allege that, through Barranco's employment as a manager of the Print3D Business, he made numerous requests for 3D Systems to honor its promises to commit resources to the development of the Print3D Business, but 3D Systems refused. Plaintiffs contend that 3D Systems did not commit any resources to the Print3D Business, and never had any intention of doing so in the first place.  Plaintiffs assert that 3D Systems, Gregoire, and others conspired to purchase the Print3D Business at a discounted price, while ensuring that Barranco could not compete. Gregoire and others then made false promises and representations so as to induce Plaintiffs to enter into the Agreement Letter and Acquisition Agreement, which included a five-year non-compete clause for Barranco.  [Id. at ¶¶ 98-101.]

11

Plaintiffs assert that, although 3D Systems initially integrated the Print3D Business's software into 3D Systems's software, it did so only to "ease the integration of Print3D's Business' assets into Quickparts, a separate profit center of [3D Systems]." [Id. at ¶ 102.]  About six months after the close of the sale, the Print3D Business was integrated into Quickparts. Barranco objected to the integration because it was contrary the contractual obligations of 3D Systems under the Acquisition Agreement.  [Id. at ¶¶ 103-05.]

Plaintiffs contend that, after the integration, Quickparts began using the Print3D Plug-in for its offline quoting systems.  Plaintiffs contend that the integration of the Print3D Business has significantly contributed to the growth of Quickparts's business.  According to Plaintiffs, at the time 3D Systems closed the purchase of the Print3D Business, Quickparts had approximately $30 million in revenue, and currently has revenue in excess of $150 million.  Plaintiffs allege that, to date, 3D Systems has neither provided Print3D with any calculation of payments due pursuant to the Acquisition Agreement nor paid Print3D any monies derived by 3D Systems's use of the Print3D Business for Quickparts or for any other use.  [Id. at ¶¶ 106-08.]

On February 15, 2013, Barranco received a phone call from Kimberly Hale ("Hale"), the head of 3D Systems's human

12

resources department.  Hale informed Barranco that his employment
was terminated, effective that day, but offered no reason for his
termination.  Plaintiffs assert that, prior to his termination,
Barranco had not received any complaints regarding his
performance.  [Id. at ¶¶ 109-10.]

Plaintiffs filed their Complaint against Defendants on
August 23, 2013.  The Complaint asserts the following causes of
action: breach of contract against 3D Systems ("Count I"); breach
of employment agreement against 3D Systems ("Count II"); breach
of the covenant of good faith and fair dealing against 3D Systems
("Count III"); fraud against all Defendants ("Count IV");
negligent misrepresentation against all Defendants ("Count V");
unjust enrichment against 3D Systems ("Count VI"); rescission
against 3D Systems ("Count VII").

The Complaint seeks the following relief: an entry of
judgment in favor of Plaintiffs and against 3D Systems with
respect to Counts I-VII; damages from 3D Inc. in the amount of
$8,925,000 for each count; damages from 3D Corp. in the amount of
$8,925,000 for each count; an entry of judgment in favor of
Plaintiffs against Gregoire with respect to Count IV and Count V;
damages from Gregoire in the amount of $8,925,000 for Count IV
and Count V; a judgment ordering the "release of any and all of
Barranco's shares of restricted common stock, together with
interest[;]" [id. at pg. 33;] punitive damages; and attorneys'

fees and costs.  As an alternative to damages, the Complaint

seeks rescission of the Acquisition Agreement.

<u>**STANDARD**</u>

I.   <u>**Arbitration**</u>

This district court has stated:

> The [Federal Arbitration Act ("FAA")] governs
> arbitration agreements in contracts involving
> interstate commerce.  <u>See</u> 9 U.S.C. §§ 1-2.  Under
> the FAA, arbitration agreements "shall be valid,
> irrevocable, and enforceable, save upon such
> grounds that exist at law or inequity for the
> revocation of any contract."  <u>Id.</u> § 2.  "A party
> aggrieved by the alleged failure, neglect, or
> refusal of another to arbitrate under a written
> agreement for arbitration may petition" a United
> States district court with jurisdiction "for an
> order directing that such arbitration proceed in
> the manner provided for in such agreement."  <u>Id.</u>
> § 4.  The FAA also provides that "[t]he hearing
> and proceedings, under such agreement, shall be
> within the district in which the petition for an
> order directing such arbitration is filed."  <u>Id.</u>
>
> The Act's provisions reflect a "liberal
> federal policy favoring arbitration agreements."
> <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S.
> 20, 25, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)
> (quoting <u>Moses H. Cone Mem'l Hosp. v. Mercuary
> Constr. Corp.</u>, 460 U.S. 1, 24, 103 S. Ct. 927, 74
> L. Ed 2d 765 (1983)).  This "national policy" is
> enforceable in both state and federal courts and
> preempts any state laws or policies to the
> contrary.  <u>See</u> <u>Preston v. Ferrer</u>, 552 U.S. 346,
> 349, 128 S. Ct. 978, 169 L. Ed. 2d 917 (2008)
> (quoting <u>Southland Corp. v. Keating</u>, 465 U.S. 1,
> 10, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984)).
>
> . . . .
>
> In determining whether to compel a party to
> arbitrate, a district court may not review the
> merits of the dispute; rather, the court's role
> under the FAA is limited "to determining

(1) whether a valid agreement to arbitrate exists
and, if it does, (2) whether the agreement
encompasses the dispute at issue." <u>Cox v. Ocean
View Hotel Corp.</u>, 533 F.3d 1114, 1119 (9th Cir.
2008) (citation and quotation marks omitted).  In
construing the terms of an agreement, the court
"appl[ies] general state-law principles of
contract interpretation, while giving due regard
to the federal policy in favor of arbitration by
resolving ambiguities as to the scope of
arbitration in favor of arbitration." <u>Wagner v.
Stratton Oakmont, Inc.</u>, 83 F.3d 1046, 1049 (9th
Cir. 1996).  If the court determines that a valid
arbitration agreement encompasses the parties'
dispute, the FAA requires the court to enforce the
arbitration according to its terms.  <u>Lifescan,
Inc. v. Premier Diabetic Servs., Inc.</u>, 363 F.3d
1010, 1012 (9th Cir. 2004).  Therefore, a district
court must compel arbitration "unless it may be
said with positive assurance that the arbitration
clause is not susceptible of an interpretation
that covers the asserted dispute." <u>United
Steelworkers of Am.[ v. Warrior & Gulf
Navigation]</u>, 363 U.S. [574,] 582-83, 80 S. Ct.
1347 [(1960)].

If the court concludes that the lawsuit at
issue is covered by an enforceable arbitration
agreement, and one party to the agreement seeks to
enforce the arbitration provision, the court may
stay the lawsuit until the arbitration has been
completed.  9 U.S.C. § 3.  A stay, however, is not
mandatory and the court may alternatively dismiss
those claims that are subject to arbitration.  <u>See
Thinket Ink Info. Res., Inc. v. Sun Microsystems,
Inc.</u>, 368 F.3d 1053, 1060 (9th Cir. 2004);
<u>Sparling v. Hoffman Constr. Co.</u>, 864 F.2d 635, 638
(9th Cir. 1988) (holding that, when an
"arbitration clause was broad enough to bar all of
the plaintiff's claims since it required [the
plaintiff] to submit all claims to arbitration,"
those claims could be dismissed pursuant to
Federal Rule of Civil Procedure 12(b)(6)).

<u>Lexington Ins. Co. v. Centex Homes</u>, 795 F. Supp. 2d 1084, 1089-90

(D. Hawai`i 2011) (some alterations in <u>Lexington</u>).

## II.  <u>Transfer of Venue</u>

With respect to transfer of venue, the <u>Lexington</u> court

stated:

> Transfer of a case to cure improper venue is
> proper when the transfer would be "[f]or the
> convenience of the parties and witnesses," and
> would also be "in the interest of justice."  28
> U.S.C. § 1404(a).  The court may transfer venue
> *sua sponte*, so long as the parties are first given
> an opportunity to present their views on the
> issue." <u>Costlow v. Weeks</u>, 790 F.2d 1486, 1488
> (9th Cir. 1986).

<u>Id.</u> at 1090 (alteration in <u>Lexington</u>).

### <u>DISCUSSION</u>

## I.  <u>Plaintiffs' Motion to Strike</u>

Rule LR7.5 of the Local Rules of Practice of the United

States District Court for the District of Hawai`i ("Local Rules")

provides, in relevant part:

> (b)  A brief or memorandum in support of or
> in opposition to a motion, petition, or appeal may
> exceed the page limitation in LR7.5(a) if it
> contains no more than 9,000 words.

> (c)  A reply brief or replay memorandum,
> including one filed by a *pro se* party, shall not
> exceed fifteen (15) pages in length, unless it
> contains no more than half of the words specified
> for a brief or memorandum in support of or in
> opposition to a motion . . . .

In their Reply, Defendants incorporate by reference the

respective reply brief filed in <u>Barranco v. 3D Sys. Corp., et</u>

<u>al.</u>, CV 13-00412 LEK-RLP ("the CV 13-00412 Action" and "the CV

13-00412 Reply").  [Reply at 18.]  Although Defendants' Reply

consists of eighteen pages, it appears to just barely satisfy the word limit set forth in Local Rule 7.5(c).  Plaintiffs argue, however, that Defendants' Reply in the instant case actually exceeds the word limit because it incorporates the CV 13-00412 Reply by reference.  [Motion to Strike at 2.]

Contrary to Defendants' assertions in the Reply, the Court does not find that the arguments made in the instant case with respect to the issues of personal jurisdiction and transfer of venue are the same as those made in the CV 13-00412 Action. Although both the instant action and the CV 13-00412 Action allege common facts and consist of common parties, each action arises out of a different contract.  Thus, Defendants may urge the Court to reach the same conclusions in both cases regarding these issues, but the analyses the Court conducts to reach those conclusions will differ, depending on the unique facts of each respective case.  To the extent that the CV 13-00412 Reply contains some variations of Defendants' arguments in the instant Reply, the Court's consideration of these variations incorporated by reference would effectively allow Defendants to circumvent Local Rule 7.5(c).  Thus, the Court HEREBY GRANTS the Motion to Strike.[2]

---

[2] Although the Court has stricken Defendants' incorporation of the CV 13-00412 Reply by reference, it has independently reviewed the CV 13-00412 Reply, and finds that it does not

(continued...)

## II. **Defendants' Motion**

In their Motion, Defendants argue that: (1) the FAA requires that the parties arbitrate their dispute, and the Court should therefore dismiss the case or stay the proceedings pending arbitration; [Mem. in Supp. of Motion at 17-19;] (2) the Complaint should be dismissed for lack of personal jurisdiction over Defendants; [id. at 19-21;] and (3) the Court should transfer the case to the United States District Court for the District of South Carolina, pursuant to 28 U.S.C. § 1404(a) [id. at 28].

### A. **Applicable Law**

As an initial matter, Defendants argue that New York law governs the Acquisition Agreement, including the arbitration provision therein ("Arbitration Clause"). [Id. at 10.] Plaintiffs, however, argue that Hawai`i law governs. [Mem. in Opp. at 4-5.] The Acquisition Agreement provides that the "[Acquisition] Agreement shall be construed, interpreted, enforced and governed by and under the laws of the State of New York (without giving effect to the principles of conflicts of law)." [Complaint, Exh. E at 25.] This choice of law provision, however, does not necessarily end the inquiry into what law applies.

---

[2](...continued)
contain any argument that would change the Court's analysis of the instant Motion.

Federal courts may preside over state law claims pursuant to their diversity jurisdiction under 28 U.S.C. § 1332. "Diversity jurisdiction requires complete diversity between the parties-each defendant must be a citizen of a different state from each plaintiff." In re Digimarc Corp. Derivative Litig., 549 F.3d 1223, 1234 (9th Cir. 2008) (citation omitted). A federal court sitting in diversity applies the forum state's substantive law, see Erie R.R. v. Tompkins, 304 U.S. 64 (1938), including the forum state's choice of law analyses. See Van Dusen v. Barrack, 376 U.S. 612, 628 (1964). Pursuant to § 1332(a)(1), this district court has diversity jurisdiction over the instant case because complete diversity exists between the parties and the amount in controversy exceeds $75,000. [Complaint at ¶¶ 10-14.]

The Hawai`i choice of law analysis places primary emphasis on the determination of "'which state would have the strongest interest in seeing its laws applied to the particular case.'" Unified W. Grocers, Inc. v. Twin City Fire Ins. Co., 457 F.3d 1106, 1111 (9th Cir. 2006) (quoting Lewis v. Lewis, 69 Haw. 497, 748 P.2d 1362, 1365 (1988)); see also Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund. Ins. Co., 117 Hawai`i 357, 364, 183 P.3d 734, 741 (2007). This district court, however, has recognized that, under Hawai`i law, "'a choice of law provision provided in a contract between the parties will

generally be upheld.'" <u>Hawaii Forest & Trail Ltd. v. Davey</u>, CV 07-00538 HK-BMK, 2009 WL 47331, at *3 (D. Hawai`i Jan. 8, 2009) (quoting <u>Del Monte</u>, 117 Hawai`i at 364, 183 P.3d at 741).[3] This Court need not determine whether the Hawai`i choice of law analysis requires the application of Hawai`i law or New York law because the applicable principles of contract interpretation are the same under either jurisdiction's case law.

   B.   <u>Arbitration</u>

       The parties do not dispute that the Arbitration Clause is valid and enforceable, and Plaintiffs apparently do not deny that their claims are subject to arbitration.  Rather, the dispute in this case concerns whether the American Arbitration Association ("AAA") must conduct the arbitration, and what constitutes an "arbitration proceeding."

       The Arbitration Clause in this case provides, in pertinent part:

> The parties shall endeavor to resolve any controversy, claim or dispute (collectively a "Disputed Matter") arising between them out of or relating to this Agreement, or with the performance or breach of this Agreement (including any disputes with respect to payment obligations arising under this Agreement), by negotiation between the parties to this Agreement.  The

---

[3] The Hawai`i Supreme Court in <u>Del Monte</u> noted that, in <u>Airgo, Inc. v. Horizon Cargo Transport, Inc.</u>, 66 Haw. 590, 595, 670 P.2d 1277, 1281 (1983), it stated that the parties' choice of law provision will be upheld if that law has some nexus with either the parties or the contract.  <u>See</u> <u>Del Monte</u>, 117 Hawai`i at 364-65, 183 P.3d at 741-42.

parties involved in a Disputed Matter shall, prior to initiating any litigation or arbitration, attempt in good faith to settle such dispute, for a period of thirty (30) days following the date on which a party notifies the other party or parties of a Disputed Matter though consultation and negotiation, in good faith and a spirit of mutual cooperation. . . .  Any such Disputed Matter that is not resolved by negotiation shall be settled by binding arbitration, and in connection therewith the parties agree that:

> (i)  Either 3D Parent or Print3D or the Shareholders may initiate arbitration of a Disputed Matter by giving written notice to the other ("Arbitration Notice").
>
> (ii)  Within forty-five (45) days after the date on which the Arbitration Notice is given, the parties shall agree upon a single arbitrator or, if they fail to do so for any reason, at any time after the expiration of such forty five (45) day period, either party may request the American Arbitration Association (or any successor organization if the American Arbitration Association no longer exists) to designate an arbitrator. Any arbitration proceeding shall be held in Charlotte, North Carolina.

[Complaint, Exh. E at 25-26.]

Plaintiffs argue that the Arbitration Clause is open to two interpretations, and is therefore ambiguous.  First, as Plaintiffs contend, the Arbitration Clause means that "DPR, as the successor organization to AAA in Hawai`i, is the appropriate arbitral tribunal . . . [and] the arbitration *hearing*, as opposed to all aspects of the arbitration, is to take place in Charlotte, North Carolina (with a DPR arbitrator presiding)."  [Mem. in Opp. at 9 (emphasis in original) (footnote omitted).]  Second, as

21

Defendants contend, the Arbitration Clause means that arbitration is to proceed with AAA in Charlotte.  [Id. at 9 (citing Mem. in Supp. of Motion at 10-11).]

It is a well-established rule of contract interpretation that, a clear and unambiguous written contract must be enforced according to the plain and ordinary meaning of its terms.  See e.g., Italian Designer Imp. Outlet, Inc. v. New York Cent. Mut. Fire Ins. Co., 891 N.Y.S.2d 260, 263 (Sup. Ct. 2009); Found. Int'l, Inc. v. E.T. Ige Constr., Inc., 102 Hawai`i 487, 495, 78 P.3d 23, 31 (2003).  Under both New York and Hawai`i law, a contract provision is ambiguous if it is reasonably subject to two different meanings when read in the context of a contract as a whole.  See Italian Designer Imp. Outlet, 891 N.Y.S.2d at 264 ("An ambiguous word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customary practices, usages and terminology as generally understood in the particular trade or business." (citations and quotation marks omitted)); Allstate Ins. Co. v. Pruett, 188 Hawai`i 174, 189, 186 P.3d 609, 624 (2008) ("ambiguity is found . . . only when the contract taken as a whole is reasonably subject to differing interpretation" (citation and quotation marks omitted)).

In this Court's view, one must strain the wording of the Arbitration Clause to apply Plaintiffs' asserted interpretation.  The Arbitration Clause is not reasonably subject to Plaintiffs' interpretation when read in the context of the entire Acquisition Agreement.  A plain reading of the Arbitration Clause supports Defendants' interpretation.  The Court therefore finds that the parties entered into a valid and enforceable agreement to arbitrate with AAA, so long as AAA is still in existence, with all aspects of the arbitration proceeding to take place in Charlotte, North Carolina.

### C. **Transfer of Venue**

Defendants acknowledge that Section 4 of the FAA limits this Court's ability to compel arbitration to within the District of Hawai`i.  [Reply at 8.]  Defendants assert that the Motion does not seek an order compelling arbitration.  Rather, "Defendants submit that the Court may dismiss the case and **declare** that the arbitration provision requires any arbitration be administered by AAA and held in Charlotte."  [Id. (emphasis in original).]  Despite Defendants' assertion to the contrary, the Court finds that the Motion essentially requests that this Court compel Plaintiffs to arbitrate their claims with AAA in Charlotte, North Carolina, pursuant to the terms of the Arbitration Clause.

The facts of this case are similar to those in
Lexington Insurance Co. v. Centex Homes, 795 F. Supp. 2d 1084 (D.
Hawai`i 2011).   In Lexington, in connection with Centex Homes's
("Centex") residential development project on the Big Island of
Hawai`i, Lexington Insurance Co. ("Lexington") issued a liability
policy ("the Policy") to Centex.   795 F. Supp. 2d at 1087.   After
homeowners notified Centex of damage to their units, Centex
sought insurance coverage from Lexington.   Lexington filed a
complaint in this district court, seeking declaratory relief
stating that it was not liable to Centex under the terms of the
Policy.   Centex then filed a motion to dismiss or, in the
alternative, to stay the case and compel arbitration in Dallas,
Texas, as required by the parties' arbitration agreement in the
Policy.   Id. at 1088.

The Lexington court stated:

> The court is persuaded that if it enters an order
> compelling arbitration, § 4 and Continental Grain
> [Co. v. Dant & Russell, Inc.], 118 F.2d 967 (9th
> Cir. 1941),] would likely require the court to
> order that such arbitration take place within the
> District of Hawaii."   Cf. Homestake Lead Co. of
> Mo. v. Doe Run Res. Corp., 282 F. Supp. 2d 1131,
> 1143-44 (N.D. Cal. 2003) (holding that Continental
> Grain bound the court to order arbitration in
> California, even thought he contractually
> designated forum was St. Louis, Missouri);
> Randhawa v. Skylux Inc., No. Civ. 2:09-2304
> WBS/KJN, 2010 WL 4069654, at *2-*3 (E.D. Cal.
> Oct. 18, 2010) (denying motion to compel
> arbitration in Chicago in light of Continental
> Grain but declining to compel arbitration in
> California because that forum was inconsistent
> with parties' agreement and instead staying case).

24

                     . . . .

                          In this court's view, however, entering an
                     order compelling the parties to arbitrate in
                     Hawaii would also run afoul of the FAA because
                     such an order would contradict the terms of a
                     valid arbitration agreement.  The Supreme Court
                     has "said on numerous occasions that the central
                     or 'primary' purpose of the FAA is to ensure that
                     'private agreements to arbitrate are enforced
                     according to their terms.'"  <u>Stolt-Neilson S.A.</u>
                     <u>[v. AnimalFeeds Int'l Corp.]</u>, [559 U.S. 662, 682,]
                     130 S. Ct. [1758,] 1773 [(2010)] (quoting <u>Volt</u>
                     <u>Info. Sciences, Inc. v. Bd. of Trs. Of Leland</u>
                     <u>Stanford Jr. Univ.</u>, 489 U.S. 468, 479, 109 S. Ct.
                     1248, 103 L. Ed. 2d 488 (1989)). . . .

<u>Id.</u> at 1091-92 (some citations omitted).

          The <u>Lexington</u> court ultimately decided to transfer the

case to the United States District Court for the District of

Northern Texas, the district in which Dallas, Texas, is located,

pursuant to 28 U.S.C. § 1404(a).  <u>Id.</u> at 1092-93.  In making its

decision, the court noted that, insofar as the parties'

arbitration agreement specified Dallas, Texas, and not Hawai`i,

as the arbitration forum, Hawai`i was the "not the proper venue

to adjudicate a motion to compel arbitration under the parties'

agreement."  <u>Id.</u> at 1092.  Despite its findings that the

underlying events occurred in Hawai`i, and that Hawai`i would

therefore be a convenient forum to resolve the parties' dispute,

the court also found that the parties' arbitration agreement

deemed Dallas, Texas a convenient forum for arbitration.  Thus,

the court concluded that it would be in the interests of justice

to transfer the case to the district that the parties had agreed

                                   25

upon when negotiating the terms of the Policy.  Id. at 1093
(citations omitted).

        Similarly, in the instant case, the Court finds that,
if this Court entered an order compelling the parties to
arbitrate, it would run afoul of the FAA because the order would
contradict the terms of the Arbitration Clause.  Insofar as the
Arbitration Clause specifies Charlotte, North Carolina as the
agreed upon arbitration forum, Hawai`i is not the proper venue to
adjudicate Defendant's motion to compel arbitration.  The Court
therefore finds that transferring the case to the location
specified in the Arbitration Clause is in the interests of
justice.  See 28 U.S.C. § 1404(a); Lexington, 795 F. Supp. 2d at
1092-93.  The Court HEREBY TRANSFERS VENUE to the United States
District Court for the Western District of North Carolina, the
district in which Charlotte is located, for further proceedings.
Such a "transfer would cure any venue issue and would allow the
receiving court to decide the issues raised by the pending motion
without concern about overriding the parties' agreed-upon forum
selection."  See Lexington, 795 F. Supp. 2d at 1093.

        The Court notes that personal jurisdiction does not
need to be established before this Court can transfer the instant
case.  See Evans v. Boston Red Sox, Civil No. 13-00262 SOM-BMK,
2013 WL 6147675, at *9 (D. Hawai`i Nov. 22, 2013) (transferring
the case under 28 U.S.C. § 1404(a) after finding that the court

26

lacked personal jurisdiction over the defendants).  Thus, the Court will not address the parties' arguments with respect to personal jurisdiction.

## CONCLUSION

On the basis of the foregoing, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and Section 3 of the Federal Arbitration Act or, in the Alternative, to Transfer Venue Pursuant to 28 U.S.C. § 1404, filed October 21, 2013, is HEREBY DENIED.  Plaintiffs' Motion to Strike Arguments Incorporated by Reference in Defendants' Reply Memorandum in Support of Motion to Dismiss, filed January 15, 2014, is HEREBY GRANTED.

The Court ORDERS the clerk of court to TRANSFER VENUE of this case to the United States District Court for the Western District of North Carolina no earlier than thirty (30) days from the date of this Order.  The clerk of court shall close the case thereafter.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, February 28, 2014.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

RONALD BARRANCO, ET AL. VS. 3D SYSTEMS CORPORATION, ET AL; CIVIL
13-00411 LEK-RLP; ORDER DENYING DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1), 12(b)(2); 12(b)(6), AND
SECTION 3 OF THE FEDERAL ARBITRATION ACT OR, IN THE ALTERNATIVE,
TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404 AND GRANTING
PLAINTIFFS' MOTION TO STRIKE ARGUMENTS INCORPORATED BY REFERENCE
IN DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS